UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 23-140-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TEDI HAWKINS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Tedi Hawkins has filed a motion seeking to withdraw her guilty plea entered on May 23, 2024. [Record No. 106] The United States filed a response opposing the motion and moved for a hearing on the matter. [*See* Record Nos. 107, 108.] Thereafter, a hearing was held on May 31, 2024. Hawkins and counsel of record were present.

Hawkins' motion will be denied for the reasons outlined below.

**I. Background**

Hawkins was charged in a Second Superseding Indictment with conspiracy to distribute and possess with intent to distribute a mixture or substance containing fentanyl and carfentanil (Count One); possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl (Count Four); and possession with intent to distribute a mixture or substance containing fentanyl and carfentanil (Count Five).[1] [Record No. 72] The United

---

[1] Fentanyl and carfentanil are synthetic opioids and Schedule II controlled substances under the Controlled Substances Act. *See* 21 C.F.R. § 1308.12(c)(6), (9). As such, they have "high potential for abuse," with use potentially leading to "severe psychological or physical dependence." 21 U.S.C. § 812(b)(2). Fentanyl is approximately 100 times more potent than morphine. *See* Press Release, Drug Enforcement Administration, DEA Issues Carfentanil Warning

States offered Hawkins a Plea Agreement, pursuant to which she would plead guilty to Counts One and Four and, in exchange, the United States agreed to move to dismiss the preceding indictments and Count Five of the Second Superseding Indictment. [*See* Record No. 96, ¶ 1.] Pursuant to the terms of the Plea Agreement, Hawkins: (i) agreed to waive the right to appeal or attack collaterally the guilty plea; (ii) agreed to cooperate fully with the United States; and (iii) acknowledged that violating any part of the Plea Agreement would permit the United States to void the parties' agreement. [*Id.* ¶¶ 7, 9, 11] By accepting the Plea Agreement, the United States agreed to move for a decrease of the offense level at sentencing, "*unless* the Defendant commits another crime, obstructs justice, or violates a court order." [*Id.* ¶ 5(f)]

Hawkins signed the Plea Agreement on May 22, 2024, agreeing to its terms and acknowledging that she understood all terms contained therein. Further, Hawkins admitted that the Plea Agreement was fully explained to her by counsel, and that her entry into it was voluntary. [*See id.* ¶ 14.]

### A. Hawkins' Guilty Plea

The undersigned presided over Hawkins' change-of-plea hearing on May 23, 2024. [Record No. 99] Prior to accepting Hawkins' guilty plea, she was placed under oath and the undersigned asked a series of questions to ensure that she understood the terms of the Plea Agreement and that she was entering a guilty plea knowingly, intelligently, and voluntarily.[2]

---

to Police and Public (Sept. 22, 2016). Carfentanil is used as a tranquilizing agent for elephants and other large mammals and is approximately 10,000 times more potent than morphine. *Id.*

[2]     Among other things, the undersigned inquired as to Hawkins' education and ability to read and write, ensured no medical conditions or medications were impairing her ability to make an informed decision, confirmed that she fully understood the terms of the Plea Agreement and that her attorney reviewed it with her. Further, Hawkins was required to acknowledge her criminal conduct and confirm her comprehension of the charges to which she was pleading guilty.

The colloquy established that Hawkins was competent, capable of entering an informed plea, and that she was indeed doing so knowingly, intelligently, and voluntarily. The Court accepted Hawkins' guilty plea and she was adjudged guilty of the offenses charged in Counts One and Four of the Second Superseding Indictment.

At the defendant's direction, Hawkins' attorney filed a motion to allow her to withdraw her guilty plea on May 29, 2024. [Record No. 106] The United States opposed the motion, noting that it offered no substantive grounds. [Record No. 107] The United States also expressed that it had "strong reason to believe" that co-Defendant Fishback has attempted to exercise undue influence over Hawkins following entry of her guilty plea. [*Id.*] The United States moved for a hearing on the matter and submitted a recorded prison telephone conversation between Fishback and Hawkins to support its claim of undue influence. [Record Nos. 108, 110]

### B. The Hearing on Motion to Withdraw Hawkins' Guilty Plea

During the hearing held on May 31, 2024, counsel for the United States advised that, despite the Court's explicit orders to the contrary, Hawkins and Fishback had been communicating with each other *via* phone and through computer tablets provided by the Woodford County Jail. Further, their tablet communications were made through a third-party to obscure their communications.[3] Both the United States and Hawkins' counsel expressed a

---

[3] The United States filed as an exhibit the typed communications between Hawkins and others between April 13, 2024, and May 25, 2024. Messages sent to and received from recipient "Tyjeer Fishback" appear to be Defendant Eugene Fishback. Hawkins was placed under oath. During the Court's questioning, Hawkins admitted to communicating with Fishback despite being her awareness that such communications were prohibited. She also admitted to using third parties to violate the Court's orders.

shared belief that Hawkins' motion to withdraw her guilty plea was the result of Fishback's undue influence. [*See* Hearing Transcript, at 02:06–:12.]

Following administration of her testimonial oath, Hawkins was reminded of her obligation to provide truthful information to the Court and was cautioned of the consequences of making false statements. Thereafter, Hawkins affirmed that she would respond honestly and that she understood the consequences of failing to do so. She then relayed her understanding of those consequences in her own words.

The following responses were then provided by Hawkins:

> **The Court:** [D]o you remember at the beginning of the plea, you were placed under oath at that time?
> **Hawkins:** Yes, I do.
> **The Court:** And you swore to tell the truth?
> **Hawkins:** Yes, I did.
> **The Court:** Did you tell the truth in that proceeding?
> **Hawkins:** No, not the whole truth.

[*Id.* at 02:14–:15] The undersigned then reviewed portions of Hawkins' re-arraignment hearing and her responses to the Court's questions. When asked about the acknowledged facts contained outlined in the Plea Agreement, Hawkins acknowledged previously admitting to those facts, but suggested that many were false.

Paragraph 3 of Hawkins' Agreement states that: "As to Counts 1, 4, and relevant conduct, the United States could prove the following facts that establish the essential elements of the offenses beyond a reasonable doubt, and the Defendant admits these facts:" [Record No. 96, ¶ 3] Subparagraph "g" includes the following factual allegations to which Hawkins previously admitted:

> On December 6, 2023, a federal search warrant was executed at the residence of Fishback and the Defendant at the Raintree apartment that had been under significant surveillance by law enforcement. Agents located a receipt inside the

apartment with the name "Eugene Fishback" listed on it. The Defendant was found to be the sole person present at the time this warrant was executed. Inside the residence, investigators located and seized approximately 116.4 gross grams, (approximately 240 individual pills) inclusive of packaging, of suspected fentanyl pills in 3 plastic bags stored in a kitchen cabinet. A large number of the pills were blue in color with the "M" marking on one side consistent with the other pills seized throughout the course of this investigation. These pill are consistent with counterfeit prescription pills known to contain fentanyl and fentanyl derivatives. The items from within the apartment were sent to the DEA Lab and tested positive for 8.82 grams of Carfentanil and 14.56 grams of fentanyl. The United States can prove that Fishback and the Defendant had dominion and control over the Raintree Apartment from where the pills were seized.

[*Id.* ¶ 3(g)] The undersigned read this portion of the Plea Agreement and asked Hawkins whether her prior admission to these facts was false.

> **The Court:** Is that a truthful statement?
> **Hawkins:** Yeah, I did stay at Raintree.
> **The Court:** Do you agree with the statement about the fentanyl pills and carfentanil pills that were found there?
> **Hawkins:** Yes.
> **The Court:** And were those your pills?
> **Hawkins:** No.
> **The Court:** Whose pills were they?
> **Hawkins:** Fishback's.

[*See* Hearing Transcript, at 02:30–:32.]

### 1. The Recorded Jail Call

The undersigned next read select portions of the recorded jail phone conversation between Hawkins and Fishback, confirming with Hawkins after each reading that she remembered the conversation and the passage read. The Court's focus in doing so was to determine whether Fishback had, in fact, exerted undue influence over Hawkins and whether that influence was the real reason for her desire to withdraw her guilty plea.

Each of the following excerpts are taken from the recorded jail phone conversation and read aloud to Hawkins. [Record No. 110] In each instance, Hawkins recalled the statement in

question.  The Court began by reading portions of the conversation during which Fishback can be heard advising Hawkins how she should proceed.[4]

> **Fishback**: You tell that Judge that your lawyer didn't explain things to you properly and you'd be actually coping out to things you didn't do, and you was in fear of a harsher punishment, which you was, if you didn't cop out.

[Record No. 111, 02:17–:28]

> **Fishback**: You lying on yourself.  You didn't understand your, um, your plea.  You're not educated to how the federal law works or none of that.  That's why you fired your first lawyer, because you didn't know how this stuff works, right?  So, you thought that pleaing would get you a lesser sentence, you didn't think you could beat it . . . .

[*Id.* at 02:55–03:16] At one point in the recorded conversation, Hawkins expresses hesitancy and raises the possibility of the Court denying her motion to withdraw her guilty plea.  In response, Fishback advises her of what to say to avoid that outcome.  Hawkins acknowledged this occurring.

> **Hawkins:** Yeah, but what about where I've already taken a plea and if they deny my withdraw?
>
> **Fishback**: They not gonna deny it.  When you go in there and say, listen Your Honor, I did not understand what I was signing because I'm not literate, or, educated to the law.  I know nothing about the law.  All I did was try to trust my lawyer.  I've already fired one lawyer because I didn't understand what he was saying, and he wasn't telling me right.  Once I talked to my family, once I took this plea—I did not talk to my family before I took it—I talked to my family, and they told me that was a bad plea.  I talked to my state attorney, you got a state attorney, your state attorney told you that was a bad plea.  You lost all your rights, . . .

---

[4]   The quotations contained herein were transcribed by the Court (without the aid of transcription software) and serve as an accurate reflection of the conversation between Fishback and Hawkins.  Certain pauses, colloquial contractions, and aposiopeses may be omitted for clarity.

[*Id.* at 07:33–08:12] Upon reading this portion of the recorded phone conversation, Hawkins interrupted asking to just keep her plea. However, the request to halt the proceeding was denied.

Upon further questioning, Hawkins advised that she is 21 years old and that she has been in a relationship with Fishback, on and off, since she was 16 years old. [*See* Hearing Transcript, at 02:46.] Hawkins was asked directly about her reason for moving to withdraw her guilty plea:

> **The Court:** Did [Fishback] coerce you to file a motion to withdraw your plea or did he convince you to do so?
> **Hawkins:** Yes, he did.

[*Id.*] The undersigned then addressed statements Fishback made to Hawkins directing her to deny ever seeing Fishback sell drugs if called to testify. In doing so, Fishback informed Hawkins that by denying certain allegations, they could both be acquitted of the conspiracy charge. Once again, Hawkins acknowledged the authenticity of these statements as well as her direct recollection of them.

> **Fishback**: If they get you to go to, um, trial and court and you have to get on the stand, you just let them know the same thing. Look, I was scared of a harsher sentence. I didn't know what the hell I was signing when I signed it. You don't know nothing about no kilos. You never seen no kilos. You never seen me with no kilos.

[Record No. 111, 03:28–:47]

> **Fishback**: We only got a two-person conspiracy. If you saying that you've never sold no kilos or none of these drugs with me, then, that makes it no conspiracy, right? . . .
> . . . If you deny that there was [inaudible] they can't, they only got a two person, so one person can't be found guilty of conspiracy. So, if they acquit me of conspiracy and hit me with possession, they can still give me fifteen years, . . . .

[*Id.* at 04:18–:33; 05:24–:40]

> **Fishback**: If you say, I've never conspired. I've never seen this man sell dope. I've never seen where this man live at. . . .

[*Id.* at 06:10–:16]

> **Fishback**: . . . we've got the best conspiracy you can have, a two-person conspiracy. If I'm saying you've never sold no drugs with me, and you saying you've never sold no drugs with me. You've never seen that sh**. You've never seen a kilo. . . .

[*Id.* at 11:36–:48] In addition to addressing Fishback's transparent coaching, the Court addressed his repeated assurances to Hawkins that he is only thinking about her best interest, that she should trust him, and that he loves her.

> **Fishback**: From the get go, I've been in your best interest. . . . Everything I've been doing is to help you get home. I'm not worried about me. I should be scared, I'm looking at thirty to life. I should be scared to death. But everybody's saying me, me, me, me, me. I'm not scared, you know why? Because if I can free you, Ima come out under ten.

[*Id.* at 11:08–:28]

> **Fishback**: You get that money on your books last night?
>
> **Hawkins**: Yeah, I got it. . . .
>
> **Fishback**: Ok. Ima put some more on there.

[*Id.* at 13:40–:50] Hawkins acknowledged all these statements as accurate parts of her jail conversation with Fishback.

Although not addressed at the hearing, the undersigned's review of the phone conversation reveals other instances of similar conduct.

> **Fishback**: Tell the truth and I promise you, you gonna be like, "gee, I love you forever because, [expletive], you got me home." All I wanna do is see you go home. I don't care what happen to me, cause I know Ima be straight. I'll get home with appeals or whatever. But, I wanna see you go home. I would never want to see you [inaudible] or locked up, doing no time. You just gotta trust me. I love you. Ima put some more money on there. . . .

- 8 -

> . . . . I know you scared, but don't be scared. God got you, Fam. This sh** happens for a reason. God got you. I got you, alright?
>
> **Hawkins**: Ok. I know.
>
> **Fishback**: I never leave you for dead. I don't give a [expletive] what happens, [expletive]. I die about you and you know that. I love you, [expletive].

[*Id.* at 14:20–:45; 14:58–15:16]

### 2. The Jail Tablet Text Messages

As the Court concluded its review of the recorded phone conversation, counsel for Hawkins advised that Hawkins' text messages sent *via* jail tablet confirm that she was influenced by Fishback and was heeding his advice. Although these messages were not discussed with specificity during the hearing, they further demonstrate Fishback's influence over Hawkins and her reluctance to proceed to trial voluntarily.

In a message sent by Hawkins on May 20, 2024, to an individual identified as "Dennis Smith," she expresses the following concern:

> . . . I was going to go to trial, I feel the only reason I was going was because I was listening to G.[5] Listening to him tell me I would go home and all this other stuff but I just had kept thinking and I know I'm not. . . . I don't have any kids I haven't done anything for myself that I can actually say I'm proud of and he was taking care of me putting money on my books with the cars he rented out but now that I'm taking a plea I haven't gotten anything and he's not talking to me so I think he's mad. It's like without him I am nothing I have nothing and the moment we get into it I have to figure out a different what to eat in here I can't spend 10-15 doing that.

---

[5]   "G" appears to be a reference to Fishback's nickname, Geno.

[Jail Tablet Messages, p. 145] That same day, Hawkins received a message from an individual identified as "Tyjeer Fishback." The content of the message makes clear that it is indeed Defendant Eugene Fishback. The message, which is explicit throughout, is berating in tone.[6]

> I see now that your dumber than I thought and don't know nothing about the law!! . . . You sound like yo damn momma!!! Just ignorant!!! . . . You been selfish since I met you!!! . . . Dumbass they still booked you I been tried to free you but unlike yo daddy I ain't no mf rat!!!

[*Id.* at 146–47]

The two continued to message after Hawkins entered her guilty plea on May 23, 2024. In a series of messages sent from Fishback to Hawkins on May 24, 2024, Fishback tells Hawkins that she "signed off all [her] rights. Esp ineffective counsel," that the story of her accepting a plea deal was "all over fb on the news break," and that the government's case was so bad they assigned Hawkins' counsel as a means of making her plea to "fix problems" for the government. [*Id.* at 157–61] Fishback also expressly instructs Hawkins to withdraw her plea. "Now you Ask to withdraw until your at least comfortable with things is all im sayin !" [*Id.* at 161] "If one person gets accquitted of the Charge. We both do. But u gotta take yo plea back. Because what u just signed kills that if i beat em." [*Id.* at 166] Fishback also tells Hawkins, "You're going to be okay when you got to trial you get all your rights if you lose and no jury is going to look and say yeah she sold kilos with this man passion gets you home in a year." [*Id.* at 163]

### C. Determination Announced at the Hearing

The undersigned announced at the conclusion of the motion hearing that Hawkins would not be permitted to withdraw her motion to withdraw her guilty plea and that the motion

---

[6] The excerpt below represents small snippets contained within the one-page message.

itself would be denied for the reasons articulated throughout the hearing. The undersigned also informed the parties that a Memorandum Opinion and Order would be entered in addition to the decision announced but reasoned that a timely announcement of the Court's ruling would prevent further delay and/or prejudice to the United States as it prepares for the start of trial on June 3.

## II. Legal Analysis

"A defendant does not have an absolute right to withdraw a guilty plea." *United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006) (citations omitted). Federal Rule of Criminal Procedure 11(d)(2)(B) provides that a defendant may withdraw her plea prior to sentencing if she demonstrates "a fair and just reason for withdrawal." In determining whether the stated reason meets that standard, the Court assesses the following factors:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained [her] innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*United States v. Goddard*, 638 F.3d 490, 494 (6th Cir. 2011) (citation omitted). "The relevance of each factor will vary according to the 'circumstances surrounding the original entrance of the plea as well as the motion to withdraw.'" *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008) (citation omitted).

### A. Elapsed Time

Turning to the first factor, the United States Court of Appeals for the Sixth Circuit has explained that the purpose behind Rule 11 is to permit "a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to

enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'" *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991) (quoting *United States v. Carr,* 740 F.2d 339, 345 (5th Cir. 1984).

"The shorter the delay, the more likely a motion to withdraw will be granted, and a defendant's reasons for filing such a motion will be more closely scrutinized when he has delayed his motion for a substantial length of time." *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (citation omitted). But there is no "precise cut-off point beyond which delay is unreasonable," *United States v. Carpenter*, 554 F. App'x 477, 481 (6th Cir. 2014), and the Sixth Circuit has affirmed decisions denying the withdrawal of a guilty plea "where as few as three days had elapsed between the entry of the plea and the motion to withdraw," *United States v. Powell*, 236 F. App'x 194, 198 (6th Cir. 2007) (citing *United States v. Rankin,* No. 95-3112, 1996 WL 464982, at *3 (6th Cir. Aug. 14, 1996)).

Hawkins entered her guilty plea on May 23, 2024, and moved to withdraw that plea on May 29, 2024—a mere six days later. [*See* Record Nos. 99, 106] While this factor favors granting Hawkins' motion, it is not viewed in isolation. The Court views this in light of the other six factors.

### B.  Delay in Withdrawing the Plea

The Court also looks to the reasons for any delay in requesting a withdrawal. Ordinarily, the Court considers why a defendant took so long to seek a withdrawal. But in this instance, the Court focus is on Hawkins' quick change of course immediately following her discussion with Fishback. By Hawkins own admission, which is consistent with the evidence presented above, the Court concludes that the motion to withdraw was the direct result of undue influence exercised by Fishback.

In *Carpenter*, the Sixth Circuit recognized that "certain abusive or coercive behavior might excuse an otherwise lengthy delay." *Carpenter*, 554 F. App'x at 482. This principle recognizes that a guilty plea, like other forms of confession, "must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43 (1897). A guilty plea is "the voluntary expression of [a defendant's] own choice," one which cannot result from "mental coercion overbearing the will of the defendant." *Brady v. United States*, 397 U.S. 742, 748, 750 (1970). The Court sees no reason why this important principle should not apply with equal force when assessing one's reason for withdrawing a guilty plea, particularly when it has been entered knowingly, intelligently, and voluntarily.

Just as the Court is instructed to determine whether a plea is entered voluntarily by considering "all of the relevant circumstances surrounding [the plea]," so too must it consider the circumstances surrounding Hawkins' motion to withdraw. *Id.* at 750.

The recorded phone call and messages between Fishback and Hawkins capture Fishback instructing Hawkins on what to say to the undersigned, coaching her on how to testify before a jury if called to do so, providing her with baseless legal advice, discussing her ability to help acquit them both on the conspiracy charge, and assuring her of his love for her and his altruistic motives. *See supra*, Part I. Throughout the call, Hawkins appears receptive to Fishback's advice and guidance—a fact confirmed by her subsequent motion to withdraw her guilty plea. But Fishback's repeated promises of a better outcome for both if Hawkins' withdraws her plea, speaks to the very sort of improper influence that courts are tasked with identifying prior to accepting a plea in the first instance. Considering the evidence before the

- 13 -

Court, the undersigned cannot conclude that Hawkins' *motion to withdraw* was made intelligently or voluntarily. Based upon this finding alone, it would be improper for the Court to grant Hawkins' motion to withdraw her guilty plea. Notwithstanding this conclusion, the Court will address the remaining factors in abbreviated fashion.

### C. Maintaining Claims of Innocence

The third factor asks whether Hawkins has asserted or maintained her claims of innocence. "[T]he absence of a defendant's vigorous and repeated protestations of innocence support the denial of a motion to withdraw a guilty plea." *Baez*, 87 F.3d at 809. Any intentions Hawkins may have of professing innocence are directly contradicted by the signed admissions contained within her Plea Agreement and her acknowledgement of guilt during her re-arraignment hearing. [*See* Record Nos. 96, 99.] Prior to accepting Hawkins' guilty plea, the undersigned asked her to explain what she had done to be guilty of the subject counts. Hawkins did so without making any claims of innocence, express or implied. Even Hawkins' motion seeking to withdraw her guilty plea is without an assertion of innocence. In short, the Court has been provided with no evidence to contradict Hawkins' "solemn declarations in open court," which "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

### D. The Circumstances Surrounding Hawkins' Guilty Plea

The circumstances surrounding the entry of Hawkins' guilty plea do not support granting her motion to withdraw. Both the Plea Agreement and the Court's pre-acceptance colloquy are aimed at ensuring a defendant's decision to plead guilty is informed and voluntary. The record does not demonstrate that Hawkins was uninformed or pressured to entering a guilty plea. To the contrary, the defendant demonstrated a strong willingness to

self-advocate in March 2024, when she expressed discontent with her appointed CJA counsel and requested the Court provide her with a new attorney. [Record No. 59] Hawkins' request was granted and she expressed satisfaction with her new counsel during her change-of-plea hearing.

The only discussion of an uninformed or nonvoluntary guilty plea appears in the recorded jail phone call, where Fishback coaches Hawkins on how to ensure her motion to withdraw is accepted by the Court. His role is of particular importance. As Hawkins' co-defendant, it would be to his benefit to have Hawkins withdraw her plea and proceed to trial in accordance with his explicit instruction. By denying the factual information to which she has already admitted under oath, Hawkins would be denying material issues in the case that would be relevant to both defendants.

### E.  Nature, Background, and Criminal Justice Experience

Hawkins' nature and background are effectively a wash in the Court's analysis. While she is young and impressionable, and no doubt under the influence of Fishback, she is not an ignorant person. Hawkins stood before the undersigned and demonstrated her ability to synthesize information, comprehend the Court's questions, and respond appropriately to those questions. There is no evidence that would lead the Court to question her ability to knowingly, voluntarily, or willingly enter a guilty plea.

When the Court considers whether a defendant's prior experience with the criminal justice system weighs for or against granting a motion to withdraw a guilty plea, it does so with a focus on the defendant's ability "to fully understand [her] rights and the process." *Goddard*, 638 F.3d at 495. Hawkins' petitioning the Court for new counsel demonstrates an understanding of her rights and a willingness to assert those rights. This awareness indicates

that Hawkins "[is] not a naïve stranger to the criminal proceedings in which [she] [is] involved." *United States v. Pluta*, 144 F.3d 968, 974 (6th Cir. 1998). This conclusion is further supported by the evidence presented by the United States, which demonstrates Hawkins has at least some degree of knowledge with respect to sentencing guidelines and calculations.

### F.  Prejudice to the United States

Finally, granting Hawkins' motion would prejudice the United States. Since the time the defendant entered her guilty plea, the Government has proceeded under the reasonable assumption that it would be proceeding to trial against only one defendant. The impact of this assurance is magnified when a single weekend separates resolution of this motion and the start of trial. Even in denying this motion, the United States will be subject to some prejudice due to Hawkins inconsistent statements, denial of material facts in her Agreement, and her now-diminished credibility. But any prejudice already visited on the United States would be improperly magnified were the Court to grant Hawkins' motion.

### III.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that Defendant Hawkins' motion to withdraw her guilty plea [Record No. 106] is **DENIED**.

Dated: June 3, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky